BEAM, Circuit Judge,
concurring and dissenting.
I concur in the court’s conclusion that the district court must enter judgment for Gregory Wersal and the other plaintiffs (collectively plaintiffs) on their “announce clause” claim. I believe that the plaintiffs are also entitled to judgment on their “partisan activities” and “personal solicitation” claims. Accordingly, I dissent from the court’s holdings on these issues.
*1050 I begin by again noting that Minnesota’s decision to popularly elect judges invokes the need to fully and strictly apply the requirements of the First Amendment, including the Amendment’s speech and associational mandates. If Minnesota wants judicial elections, it must provide the constitutional trappings required for such procedures. As Justice O’Connor noted in her concurrence above, Minnesota cannot ignore the “ ‘crocodile [it has chosen to place] in [its] bathtub.’ ” Republican Party v. White, 536 U.S. 765, 789, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (quoting former California Supreme Court Justice Otto Kaus). Yet today, the court permits the State to do just that.
I adhere to the views expressed in my previous dissent, see, 247 F.3d at 885-903, and fully incorporate my remarks by reference. But this case’s present posture requires a further and different inquiry: What must we do on remand? In considering this question, the court misdefines our task and renders a decision that violates both the Supreme Court’s mandate and the First Amendment.
I. Our Task on Remand
The court (sometimes referred to as the panel majority or majority) gives great weight to its previous decision. This is error. The last time this case was before us, the panel majority, over my dissent, upheld the solicitation clause, the partisan-activities clause, and the announce clause. The Supreme Court granted certiorari to consider the announce clause. It reversed, explained why it reversed, and remanded the case for proceedings consistent with its opinion. White, 536 U.S. at 788, 122 S.Ct. 2528. On remand, instead of simply asking what the Court’s order and opinion command, the majority clouds our task by misapplying the law-of-the-case doctrine.[9]
We owe no deference to the court’s earlier decision. The Supreme Court ordered us to proceed consistently with its opinion. Our only task on remand should be to ensure that we render, remand, or vacate consistently with the Supreme Court’s mandate:
A corollary to the principle that a mandate is completely controlling as to all matters within its compass is the rule that, upon a reversal and remand for further consistent proceedings, the case goes back ... for a new determination of the issues presented as though they had not been determined before, pursuant to the legal principles enunciated in the ... opinion.
Poletti v. C.I.R., 351 F.2d 345, 347 (8th Cir.1965) (emphasis added). This de novo review is absolute because, when the mandate tells a lower court to proceed consistently with an opinion, the opinion and its teachings become part of the mandate. Bailey v. Henslee, 309 F.2d 840, 843 (8th Cir.1962); see Bankers Trust Co. v. Bethlehem Steel Corp., 761 F.2d 943, 949 (3d Cir.1985).
Although the court cites a case that proceeded properly on remand, Shrink Missouri Government PAC v. Adams, 204 *1051 F.3d 838, 840 (8th Cir.2000), Shrink does not support the court’s actions. The court cites Shrink for the proposition that “[w]here the Supreme Court’s reasoning in disposing of one issue in a case affects the validity of our earlier disposition of other issues in the same case, we will reconsider those issues on remand.” Ante at 1042. Then, the court defines our task as determining whether “the law applied by this court or by the district court in deciding the partisan activity or solicitation clause issues was wrong.” Ante at 1043. But the court ultimately departs from any permissible interpretation of the law-of-the-case doctrine (or any other standard of review I can find). Two problems evidence this departure. First, the court defers to a ruling that no court has ever made. And second, the court adheres to rulings it made before, even though the Supreme Court’s new teachings require precisely the opposite rulings. I address each in turn.
II. The Court Defers to a Ruling it Never Made
Although it is undisputed that both the partisan-activities and solicitation clauses must be justified by a compelling state interest, and although these clauses restrict core, political, election speech, the last time this case was before the court, the panel majority upheld the restrictions based on an interest it forgot to define.
The Court of Appeals concluded that [Minnesota] had established two interests as sufficiently compelling ... preserving the impartiality of the state judiciary and preserving the appearance of the impartiality of the state judiciary.... [A]lthough the term is used throughout the Eighth Circuit’s opinion, the briefs, the Minnesota Code of Judicial Conduct, and the ABA Codes of Judicial Conduct, none of these sources bothers to define it.
White, 536 U.S. at 775, 122 S.Ct. 2528. So the Supreme Court defined impartiality for us, and left open the possibility that judicial “openmindedness” is or might become a compelling state interest.
Even though the panel majority did not define “impartiality” or “openmindedness” in the previous appeal, it does not return to this compelling-state-interest question. Instead, the majority claims to have exercised remarkable foresight and near-psychic precision when it states today that it earlier “focused on what we can now recognize as impartiality in Justice Scalia’s third sense of the word: open-mindedness.” [10] Ante at 1043.
This stunning metamorphosis to the determinations the panel now says it made in its previous opinion presents, to borrow Justice Scalia’s words, “a challenge to the credulous.” White, 536 U.S. at 780, 122 S.Ct. 2528. And the majority further states that because the Supreme Court left open the possibility that openmindedness might be a compelling state interest, its supposed reliance upon such an interest was not shown to be wrong. Ante at 1044. This self-serving analysis is fatally incorrect for obvious reasons. The analysis focuses on the recognition of a newly minted compelling state interest that the Supreme Court scolded the majority for not finding or defining.
When the government suppresses election speech, the Constitution demands strict scrutiny; that is, a narrowly tailored restriction designed to serve a compelling state interest. White, 536 U.S. at 774-75, 122 S.Ct. 2528. Yet the panel majority, in neither its previous effort nor in today’s *1052 opinion, has discussed how or why “open-mindedness” is a compelling state interest that can be used to suppress election speech and associational activities. Neither did Justice Scalia.
As already noted, in its earlier opinion, the panel majority simply asserted that judicial impartiality (a term it forgot to define) was a compelling state interest. Only later did the Supreme Court define impartiality for us. And while the Supreme Court acknowledged openmindedness as a possible use as a subset of the word impartiality, and acknowledged the possibility that that possible subset was a compelling state interest, the panel today claims earlier reliance on this later-defined interest and, without further discussion, declares that it previously found this undefined interest compelling. If the panel’s present statements accurately describe its earlier holdings, then one of the following statements must be true: either the Supreme Court missed the panel’s previous message, or the previous panel was able to examine an undefined term so closely as to label it compelling. But neither is true. Our role as an inferior court requires that we reject the first option. And we must reject the second because the very ideas of fundamental rights and strict scrutiny require that before we deem an interest compelling, we must know what that interest is. Because neither statement is true, the court’s opinion misstates what occurred.
The Supreme Court refused to pursue this crucial question because it did not believe that the Minnesota Supreme Court had adopted the “announce” clause for the purpose of protecting the openmindedness of judges. There is even less chance (hardly any chance at all) that the Minnesota court adopted the partisan-activities and solicitation restrictions to protect judicial “openmindedness.” Indeed, there is almost no readily discernible connection between the words contained in these restrictions and “how a [judicial] candidate would decide certain eases if elected.” Ante at 1044.[11]
So, as a fundamental first step, we should ask whether “openmindedness” is a compelling state interest at all.[12] After all, the Supreme Court left open only the possibility that openmindedness, as a desirable judicial trait, rises to the level of a “compelling state interest.” The Supreme Court did not find it to be so and, upon proper consideration, it may be found to fall well short of the fundamental interest necessary to fit into this constitutional category.
Then, because we have never scrutinized the restrictions under the only interest that can possibly support them (openmind-edness), we should do so now. We should ask, for example, whether preventing a judge from sending his or her own fund- *1053 solicitation letter is necessary to preserve the judges “willing[ness] to consider views that oppose [existing] preconceptions, and remain open to persuasion, when the issues arise in a pending case,” the hallmarks of “openmindedness” according to Justice Scalia. White, 536 U.S. at 778, 122 S.Ct. 2528. This is especially true when Minnesota forbids the judge from learning of a solicitee’s response or lack thereof. But, beyond this question, it is my view that the solicitation clause is unconstitutional for a more specific reason. The only way the solicitation clause survives strict scrutiny is if it is necessary and narrowly tailored to further the compelling state interest of judicial openmindedness. The Minnesota canon does not allow a judge to even sign a solicitation request. This is one aspect of a more complicated rule purportedly designed to protect the state’s interest. But this part of the restriction renders the law not narrowly tailored. Stated another way, in a state where a judge cannot learn of his donors, to keep the judge’s mind “open,” must the state prohibit the judge from even signing solicitation letters? Of course not.[13]
III. Underinelusiveness and the Partisan-Activities Clause
Nor do I understand, even under its misguided application of the law-of-the-case doctrine, how the panel can adhere to its view that underinelusiveness is not an independent ground to challenge a restriction on election speech (and now, by analogy, partisan activities). I simply questioned this premise in my earlier dissent, but Justice Scalia defenestrated it in White: “A law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited.” 536 U.S. at 780, 122 S.Ct. 2528 (internal marks and citations omitted). But the panel now agrees with neither Justice Scalia nor with me.[14]
The majority’s view on underinelusiveness is an interesting but unsupportable position because I am certain that Justice Scalia meant what he wrote in White. His words bear repeating: “A law [here the partisan-activities restriction] cannot be regarded as protecting an interest of the highest order [possibly a judge’s open-mindedness] ... when it leaves appreciable damage to that ... interest unprohibit-ed.” Id. The panel apparently does not dispute that we must strike down the partisan-activities clause unless we regard it as protecting an interest of the highest order. But somehow (and I admit I do not see how) the court feels free to finesse this Supreme Court language to allow the par *1054 tisan-aetivities clause to purport to protect judicial openmindedness even though the clause leaves appreciable damage (affiliation with and the support from other special-interest groups) unprohibited.[15] The facts establish the probability of greater harm to judicial openmindedness from as-soeiation with these other narrowly fo-eused, politically active groups who have *1055 persistent interest in many of the cases an elected judge may be called upon to decide in the Minnesota courts.[16]
Even so, the majority never examines whether these other political contacts pose an “appreciable danger.” If a law cannot pass strict scrutiny when it leaves an appreciable danger unprohibited, the starting place must be to ask whether an appreciable danger exists at all and, if so, does the law leave it unprohibited? This is the essence of the “underinclusiveness” inquiry and it clearly is an independent ground for challenging the restriction. And although the panel correctly notes that the underinclusiveness challenge clearly points toward two other fatal defects in the Minnesota law, the unprotected-appreeia-ble-danger challenge stands on its own and defeats the Minnesota rule.
In short, although the panel’s interpretation of Supreme Court underinclusiveness jurisprudence is inventive, I choose Justice Scalia’s binding interpretation of the law. The Minnesota partisan-activities clause, as presently written, violates the Constitution.
IV. CONCLUSION
The panel majority uses the discretionary, judicial-economy-based, law-of-the-case doctrine to reach an unsupportable result. Minnesota has failed to establish a “compelling state interest,” at least one with a discernible connection to the regulations at issue. One regulation is woefully underinclusive and the other overly broad but with no real connection to a constitutionally protectable interest. The majority construes its previous ruling as deciding a question that did not exist when the decision was rendered. And, the panel defers to its own hypothetical ruling instead of applying the mandate of the Supreme Court. For these reasons, and those expressed in my previous dissent, I concur in the court’s invalidation of the Minnesota Supreme Court’s announce clause, but dissent from the court’s failure to invalidate the partisan-activities and solicitation restrictions.

. Footnote 5 of the court’s opinion further muddies the water. First, the court writes that we apply the law of the case unless intervening authority clearly demonstrates that the law of the case was wrong. Next, the court cites Shrink, a case that never mentioned the doctrine. Then, the court ultimately concludes that the "clearly demonstrates” language is merely a redundant statement of the Shrink rule, which allows for a de novo review of legal questions. To the extent that footnote 5 suggests that the court is conducting a de novo review of the panel's previous opinion in light of the Supreme Court's teachings, I agree with that footnote. But I am not convinced that the opinion's text says or means what the footnote suggests, and in any event, the footnote does not accurately describe the way the court actually applies the doctrine.

. A computer scan of the majority’s previous opinion fails to disclose its use of the words "openminded” or "openmindedness” in any definitional discussion of the words impartiality or judicial impartiality.

. This is especially true with the solicitation clause, as shown by the panel majority’s rejection of Weaver v. Bonner, 309 F.3d 1312 (11th Cir.2002) (striking down solicitation clause). The majority opinion states that because the solicitation clause considered by the Eleventh Circuit did not prohibit the candidate from knowing of solicitation responses or declinations, as does the Minnesota rule, the Minnesota version passes muster. If this is correct, the disconnect between the rule and judicial openmindedness is all the more obvious.

. The New York Court of Appeals's Watson decision-which of course does not bind us-adds nothing to this case. See ante at 1045 (citing In re Watson, 100 N.Y.2d 290, 763 N.Y.S.2d 219, 794 N.E.2d 1, 7 (2003) (per curiam)). In Watson, the defendant defined impartiality, and the plaintiff did not dispute that interest's compelling status. In re Watson, 763 N.Y.S.2d 219, 794 N.E.2d at 6. The fact that the Watson court reached this uncontested conclusion does not magically insert an analysis into the void left by the panel majority's previous decision.

. Footnote 8 shows just how forgiving the court views the strict-scrutiny standard; indeed, the court’s language appears better suited for rational-basis review. The court asserts that the ban on personal solicitation is justified because “it is natural to expect contributors to respond to the candidate rather than the committee” if the candidate signs the letter. This footnote is wrong because it assumes that either candidates will violate the law or that their contributors will not follow the candidate’s direction to reply in the way the, law allows. Why is it not "natural to expect” that candidates will obey the law and direct replies to the committee, as the rules require? And why would we expect the contributors to do anything but obey the candidate’s direction? The record does not even approach answering (or even asking) these questions. The court fails to realize the significance of strict scrutiny-and its burden-of-proof allocation-when it chooses, by default, the speech-suppressing answer based on its own unsupported hypothesis.

. Perhaps the court does not feel this language is binding. In White, Justice Scalia wrote for the Court and cited that language from one of his concurring opinions. The fact that the language used to be non-binding does not change the fact that it is now the law.

. Even though Justice Scalia wrote the applicable rule in this very case when the Court reversed the first time, the majority today ignores that language and instead relies upon McConnell v. FEC, - U.S. -, -, 124 S.Ct. 619, 694-98, 157 L.Ed.2d 491 (2003). That reliance puzzles me. First, I don't understand why the court today pieces together blurbs from that several-hundred-page opinion, when Justice Scalia wrote a clear, one-sentence rule. Remarkably, even though the Supreme Court decided McConnell shortly after it decided White, and even though the McConnell opinion contained hundreds of pages and more citations than I care to count, the McConnell opinion didn’t cite White. I am quite certain that the Supreme Court did not overlook White when it wrote McConnell. Instead, it recognized that the two cases were so different as to not even justify a single citation. But this distinction does not dissuade the court today. When the puzzle pieces seem out of place, the court pounds them until they wedge together; the problem is, the pieces are not only in the wrong place, but they are from the wrong puzzle.
Even this patchwork formulation doesn't support the court's holding. In McConnell, the "Court held that the evidence in the case supported the conclusion that television advertising posed the greater threat, and therefore the record amply justifie[d] Congress' line drawing.” Ante at - (citing McConnell, - U.S. at -, 124 S.Ct. at 697) (emphasis added and internal quotations omitted). Determining which threat is "greater” requires a comparison of the two threats. In its previous opinion, the panel majority purported to examine the threats presented by association with political parties, concluded they were not arbitrary, cited inapplicable cases that support treating political parties differently, and held that the State had satisfied its heavy burden. But the panel majority never discussed (and it does not discuss today) the threats that special-interest-group association pose, even though the record highlights this problem. It certainly fails to discuss "ample” record evidence (past or present) that supports the idea that political association presents a greater threat to judicial open-mindedness than special-interest association. Indeed, the record, including a Minnesota Supreme Court hearing conducted when the court was amending the ethical rules, shows that special-interest-group association posed at least as great a threat. See Hearing on the Amendment to Canon 5 of the Code of Judicial Conduct, C7-81-300, Tr. at 36-37, 40 (Minn. Nov. 19, 1997) (Minnesota District Judge Gary Meyer testifying) ( The rule "allows a candidate for the judiciary to seek and use the endorsements of such special interest groups as the National Rifle Association, the Minnesota Citizens Concerned for Life, the National Organization for Women, Mothers Against Drunk Drivers, or any labor union. Clearly, organizations such as these can and frequently do support and oppose candidates for political office.... It appears that the proposed changes to [the rule] are an attempt to strip political affiliation from judicial elections, but at the same time, they allow and perhaps encourage candidates to adopt issue group affiliation. This doesn't take party politics out of the judicial election.... Is it appropriate for a judicial candidate to speak and appear at a MADD ... function but not a political party? Why should these special interest endorsements and activity be protected as constitutionally guaranteed free speech and assembly but political party endorsements and activity not be so protected.'').
We should not remand to the district court to allow it to review the record for evidence that is not there. There simply is not "ample” record evidence to show that this line drawing is necessary to advance the state’s interest in an openminded judiciary, or in the appearance of an openminded judiciary. In a gun-control case, how is the candidate's open-mindedness more affected by his political affiliation than his NRA affiliation? In an abortion case, would association with a political party influence judicial minds more than association with pro-life or pro-choice groups? To justify the restriction, even the court's proposed rule requires a "yes” answer to .these questions. Because neither logic nor the record supports a "yes” answer, the Constitution forbids the line drawing.

. In this regard, I take judicial notice, for instance, of candidate filings contained in Minnesota Board of Campaign Finance and Public Disclosure Reports for year 2000 and in Minnesota media reports that reveal that large law firms and their members contribute substantial sums of money to judicial candidates, especially incumbent candidates, as well as to non-judicial candidates for state and federal office. See In re Ahlers, 794 F.2d 388, 392 n. 1 (8th Cir.1986) (permitting consideration of matter outside the record on appeal), rev’d on other grounds sub nom. Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988).